# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE
## February 28, 2024 Session

## STATE OF TENNESSEE v. TYREL J. SIDWELL

**Appeal from the Criminal Court for Knox County**
**No. 120192   G. Scott Green, Judge**

_____

**No. E2022-01775-CCA-R3-CD**

_____

Tyrel J. Sidwell, Defendant, was charged in a presentment with nine counts related to the physical assault of his wife, the victim, Bithiah Lufcy, and his actions after his initial arrest. The charges included aggravated assault, domestic assault, coercion of a witness, and six counts of violation of a no contact order. Prior to trial, the coercion of witness charge was severed and the State dismissed two of the counts of violating a no contact order. A jury acquitted Defendant of aggravated assault but found Defendant guilty of domestic assault and four counts of violation of a no contact order. Defendant was ultimately sentenced to 11 months and 29 days on each conviction with the sentences to run consecutively. The trial court denied probation on the sentences for Counts 2 and 4 and suspended the remainder of the sentences to probation. Defendant appeals, arguing that the evidence is insufficient to support the convictions for violation of a no contact order because he was in custody at the time of his alleged contact with the victim. Defendant also argues that the trial court erred in denying probation and ordering Defendant to serve consecutive sentences. Because the evidence was sufficient to support the convictions and the trial court did not err in denying probation and ordering consecutive sentences, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and CAMILLE R. MCMULLEN, P.J., joined.

Eric Lutton, District Public Defender; Jonathan Harwell, Assistant Public Defender (on appeal); Michael Tabler, Heather Bosau, and Marisa Skillings, Assistant District Public Defenders (at trial), Knoxville, Tennessee, for the appellant, Tyrel J. Sidwell.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Charme P. Allen, District Attorney General; Christy Caviness and Jacob Ens, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On May 25, 2021, a little over three months after Defendant and the victim were married, the victim called 911 from their home in Knox County. During the call, the victim reported that she and Defendant got into a fight during which Defendant "beat" her, slammed her head against the ground, and strangled her. The victim stated that she was scared but that she did not need an ambulance. She wanted Defendant to be arrested.

This incident and subsequent actions by Defendant led to the issuance of a nine-count presentment by the Knox County Grand Jury in December of 2021. Defendant was charged with aggravated assault, domestic assault, coercion of a witness, and five counts of violation of a no contact order. Prior to trial, the State nolle prossed two of the counts related to violation of a no contact order. The trial court severed the count related to coercion of a witness.

At trial, the victim testified that she and Defendant were married on February 9, 2021. On the evening of May 25, 2021, at around 10:00 p.m., the victim was home alone. Defendant was at the victim's sister's home in Townsend. The victim and Defendant were supposed to be together at her sister's home, but after a "pretty big argument" the night before, the victim "felt it was in the best interest not to be there. . . ." The victim had sent text messages to Defendant all day long, but he did not reply. Defendant arrived home from Townsend a little after 10:00 p.m. According to the victim, he was "not happy" and acted "dismissive." The victim wanted to "just basically make up."

The victim was sitting on the floor of their bedroom. She and Defendant started to argue again. The victim asked him not to yell because the "walls [were] paper thin." Defendant "seemed to grow more upset" and "more angry" and walked toward the victim. The victim testified that Defendant "reached [her] by her shoulders" and "dragged [her] across the room." The victim kicked her legs trying to get Defendant to stop. The victim got to her feet, and Defendant "grabbed [her] head and threw it into the ground." The victim remembered falling to the ground. She felt pain in her head, neck, and face and the "impact of her head hitting the ground." The victim thought she might pass out, but got up again. She saw Defendant's PlayStation and "angrily grabbed the PlayStation and threw it on the ground." The victim told Defendant she was calling 911. Defendant grabbed her again, threw her on the ground, and got on top of her. He "put both of his hands around

- 2 -

[her] neck and started to try to strangle" her. The victim grabbed Defendant's glasses and broke them. She got up, ran downstairs, and called 911.

During the 911 call, the victim can be heard telling the operator that her husband "has been beating" her and "slammed [her] head into the ground." The victim explained that she thought she was "going to pass out" before Defendant strangled her. The victim was "scared" and asked that Defendant be arrested.

Officers arrived quickly. The victim was relieved but also felt angry. The victim admitted that what she told officers when she was initially questioned was different from her testimony during trial because she was responding to the questions that the officers asked. The victim had injuries including a "bright red" ear, a mark on her neck, redness under one of her eyes, and a torn shirt. The jury saw pictures of these injuries. The victim wanted Defendant to be arrested and officers told her that she would not be able to have contact with him until the charges were resolved. The victim explained that she "still loved" Defendant and wanted to work things out. She was "shocked and confused and also worried" that she would not be able to see Defendant.

Officer Zachary Doss, a patrol officer with the Knox County Sheriff's Office, was one of the officers who responded to the 911 call. Officer Doss reported that Defendant was "sitting on the front porch" when Officer Doss arrived. Defendant seemed "calm but irritated." Officer Doss described the victim as initially "calm" but increasingly "upset" and "distraught" as she recounted the events of the evening. The victim recounted the events to Officer Doss, explaining that she and Defendant got into a "verbal argument" that escalated after Defendant "got in her face," "grabbed her ankles," and "pulled her across the floor." The victim told Officer Doss that Defendant "bounced" her head off the floor and that the victim broke Defendant's PlayStation and glasses. Officer Doss explained to the victim that she could have no contact with Defendant until everything was resolved.

Officer Doss observed the victim's injuries. Her left eye was swollen, her knees were bloodied, and there was a mark on her neck. Officer Doss was unable to ascertain whether the mark on the victim's neck was caused by strangulation because of the "poor" lighting. The victim's shirt was also torn. Defendant, on the other hand, had marks on his knees. Officer Doss deemed Defendant the primary aggressor and arrested Defendant.

Defendant signed a conditional release order[1] on May 26, which is reproduced below.

**IN THE GENERAL SESSIONS COURT FOR KNOX COUNTY TENNESSEE**

STATE OF TENNESSEE      Case Number: @1400289
vs.      Offense: DOMESTIC ASSAULT
TYREL J. SIDEWELL, IDN - 1511060

FILED
APR 0 5 2023
Clerk of the Appellate Courts
Rec'd by

**DOMESTIC VIOLENCE/CHILD ABUSE CONDITIONAL RELEASE ORDER**

Pursuant to *Tennessee Code Anotated*, Section 40-11-150, the Court has reviewed the facts of the arrest and detention of the Defendant and has determined that the Defendant:

  X   1. Is a threat to the alleged victim, BITHIAN ANN LUFCY       , or other family or household member.
     2. Is a threat to the public safety.
     3. Is reasonably likely to appear in Court.
     4. Has been arrested for a criminal offense defined in title 39, chapter 13, in which the alleged victim of the offense is a domestic abuse victim as defined in 36-3-601, and that there is probable cause to believe the respondent either:
         (A) Caused serious bodily injury, as defined in 39-11-106, to the alleged domestic abuse victim; of
         (B) Used or displayed a deadly weapon, as defined in 39-11-106 determined that the defendant.
         **(Sections A-E below must be checked if the court finds #4 above)**

Pursuant to the above findings, Defendant's release or bail is conditioned on the following and it is ORDERED that the following **NO CONTACT** order(s) are entered:

  X   A. The Defendant is enjoined from committing or threatening to commit the offense set forth in the arrest warrant against the alleged victim, BITHIAN ANN LUFCY   , or other household member.
  X   B. The Defendant is prohibited from harassing, annoying, telephoning, contacting or otherwise communicating with the alleged victim, BITHIAN ANN LUFCY   , either directly or indirectly. Contact includes but is not limited to telephoning, emailing, text messaging, talking to, or using third parties to initiate contact.
  X   C. The Defendant is directed to vacate and stay away from the home of the alleged victim and to stay away from any other location where the alleged victim, BITHIAN ANN LUFCY   , is likely to be.
  X   D. The Defendant is prohibited from using or possessing a firearm or other weapon specified by the court as follows:
  X   E. The Defendant is prohibited from possessing or consuming alcohol, controlled substances, or controlled substance analogues.
     F. The defendant is ordered to not abuse, threaten to abuse, hurt or try to hurt, or frighten the alleged victim and/or the alleged victim's minor children under 18.
     G. Any other order required to protect the safety of the alleged victim, and to ensure the appearance of the defendant in court as determined by this Court as follows:

     H. Defendant is required to carry or wear a global positioning monitoring system device and, if able, pay the costs associated with operating that device and electronic receptor device provided to the victim, pursuant to TCA 40-11-152:

Hold For: 12 HOURS      Victim: BITHIAN ANN LUFCY
Bail Set at: PRE-TRIAL      IDN: 1511061

STATE OF TENNESSEE VS. Tyrel Sidewell   CASE NO. 120192   EXHIBIT NO. 5   Evd   DATE 12-2-22

IT IS FURTHER ORDERED that the Sheriff of Knox County, or any of his lawful deputies, shall provide a copy of this Order to the Defendant, the alleged victim, and all appropriate law enforcement agencies.

**\*\*\* NOTICE TO DEFENDANT \*\*\***
Date: 05/26/2021
, Magistrate  Ray H. Jenkins

If you violate this Order thinking that the other party has given you permission to do so, you are wrong and can be arrested and prosecuted. The terms of this Order cannot be changed by agreement of the parties. Only a Magistrate can change this Order. This Order remains effective through the final disposition of your case. VIOLATION OF THIS ORDER WILL CONSTITUTE CONTEMPT OF COURT AND MAY SUBJECT YOU TO IMMEDIATE ARREST AND MAY CAUSE YOUR BAIL TO BE REVOKED.

If you hurt or try to hurt anyone while this Order, probation or diversion is in effect, you may face separate charges for aggravated assault, a Class C felony. (TCA 39-13-102 (e))

I acknowledge these conditions: _____      Date: 05/26/2021
TYREL J. SIDEWELL, Defendant

ORDER DISCHARGING DEFENDANT FROM CONDITIONS OF BOND
For good cause, IT IS ORERED that the Defendant is discharged from the following Conditions:

_____      _____
Judge      Date

CERTIFIED TRUE COPY
MIKE HAMMOND, CLERK
CRIMINAL COURT
KNOX COUNTY, TN
DEPUTY CLERK

The victim testified that even after the May 25 incident, she still loved Defendant and continued to see him in person. The victim contacted Defendant by text message to tell him the "conditional release order was about to be dropped so that he could come back home and call" her.

The victim testified that on July 25, she was at home with Defendant even though they were both aware of the no contact order. The victim's sister called 911 around 10:19 p.m. to report Defendant was in violation of a no contact order. The victim's sister explained that the victim and Defendant were returning from a trip to North Carolina.

[1] We realize that the victim's first name is spelled "Bithian" in the order. However, the victim spelled her name "Bithiah" during her trial testimony.

- 4 -

Police came to the house. The victim initially told police that Defendant was not there. The police left. About an hour later, a concerned neighbor called 911 to report Defendant was in the home. The neighbor assured the 911 operator that the victim would cooperate. The victim's sister called 911 a second time to make sure that the police were coming. The police returned shortly thereafter.

Deputy Mason Bercaw with the Knox County Sheriff's Office responded to the call on July 25. Defendant and the victim were in the same room at the home when Officer Bercaw arrived. Officer Bercaw arrested Defendant.

Between August 13 and 19, Defendant called the victim several times from jail. Defendant also tried to send the victim emails. The victim had "mixed feelings" about speaking to Defendant each time he called. The victim explained that during this time she felt "out of control." She did not understand why Defendant was calling her but was also "happy" because he was calling her.

Each of these calls were admitted into evidence at trial. Defendant was incarcerated at the time each of the telephone calls were made. During a call from Defendant to the victim on August 13th, Defendant apologized to the victim for "ruining" her life and told the victim that he missed her. The victim asked Defendant if he could call back but Defendant told the victim that he did not have any money in his account. The victim asked Defendant when he would call her again.

During a call on August 14th, the victim told Defendant that she had a list of questions. Defendant told the victim that he only had about five minutes to talk. The victim asked Defendant if he knew what would happen if he were caught calling her. Defendant responded by asking the victim, "Do you not want me to call you then?" At the end of the call, the victim asked Defendant to call her again. During her testimony, the victim admitted that she sounded "crazy" during this call because she was "out of control."

During a second call on August 14th, Defendant told the victim that he figured out how to send her emails and text messages. The victim told Defendant that she could not email him back because she did not want him to get in trouble for contacting her. The victim told Defendant that she deposited money in his account for phone calls and asked him to call her again. During a third call on August 14th, the victim asked Defendant why he kept calling. Defendant claimed that he missed the victim. Defendant told the victim it was not her fault, that everything was his fault. Defendant asked the victim if they were "done." The victim responded, "How in the world could we not be done?"

Defendant called the victim a fifth time on August 14th. During this call, the victim asked Defendant why he kept calling. Defendant stated that he was "grasping at straws"

and still loved the victim but knew that "there's no coming back." The victim told Defendant that she called the police because she thought he was going to kill her.

Defendant called the victim a sixth and final time on August 14th. During this telephone call, the victim expressed her anger toward Defendant, explaining that she waited for 36 years to get married and did not want to get a divorce unless Defendant cheated on her or hurt her while she was pregnant. The victim told Defendant he hurt her head "so bad" that she had difficulty with memory. The victim asked Defendant why he hurt her. Defendant told the victim that he tried to leave the room but she would not let him and that he got angry when she broke his PlayStation.

Two additional calls were introduced by the State. These calls were from August 19th but they were not played in their entirety for the jury. The victim identified her voice and Defendant's voice on the calls. The victim admitted that she sent a text message to Defendant asking for divorce money because she was "drowning" and "desperate" for help.

Officer Nicholas Muhleisen with the Knox County Sheriff's Office testified for the defense. Officer Muhleisen responded to the 911 call on May 25 with Officer Doss. He agreed that Defendant was on the porch when they arrived. Defendant was wearing a pair of glasses but had another pair sitting by his leg. This pair "appeared to be broken." Officer Muhleisen did not see any injuries on Defendant, who appeared "aggravated." Defendant wanted to "collect his items" and leave.

Officer Doss went into the house to talk to the victim. When Officer Doss came outside about five minutes later, Officer Muhleisen went inside to talk to the victim. The victim told Officer Muhleisen that she was upstairs with Defendant when they started arguing. Defendant "dragged" her by the legs and "slammed" her head into the floor. The victim told Officer Muhleisen that she kicked Defendant's groin to "get away" from him and then she threw his PlayStation to show him "she was serious" about Defendant not putting his hands on her. The victim claimed that her head, neck, and face hurt. There were scrapes on one of her knees, redness around her shoulder, and rips on her shirt. Officer Muhleisen did not feel any swelling on the victim's head at that point but noted that "bruising and swelling can take time to develop." Officer Muhleisen was responsible for writing the report and warrant charging Defendant with domestic simple assault. Officer Muhleisen explained that "[b]ased on the information" from the scene, he "did not feel comfortable" charging Defendant with aggravated assault. Defendant's bond was denied after his July 25 arrest.

The jury found Defendant not guilty of aggravated assault by strangulation and guilty of domestic assault and four counts of violation of a no contact order. The trial court held a sentencing hearing. At the hearing, the presentence report was entered into evidence.

Defendant had a prior misdemeanor conviction for assault on the victim in North Carolina in 2022 while he was on bond for the convictions at issue herein. Defendant was placed on probation for that offense to be supervised in Ohio.[2] The conditions of his probation required him to refrain from contacting the victim, comply with a domestic violence protective order, complete a mental health evaluation, and follow the recommendations. The presentence report contained information from the Ohio probation officer indicating that Defendant had not requested or been granted permission to leave the state of Ohio.

The victim testified at the sentencing hearing. She read a victim impact statement. She described a series of more than 25 escalating assaults that spanned nearly the length of their two-year relationship. The victim explained that in March of 2020, Defendant left strangulation marks on her neck, and in June of 2020, Defendant gave her a hairline fracture in a rib by applying pressure to her chest. The victim was out of work for about a month after the rib injury. In October of 2020, Defendant gave the victim bruises and marks on her legs. In December of 2020, Defendant gave the victim a swollen and bruised cheek. In April of 2021, Defendant threw a "heavy bowl" at the victim before "strangling" and "beating" her. This was the first time that the victim remembered Defendant did not apologize for his actions.

The victim explained that Defendant wrote her a letter in which he apologized for "letting [her] down." After Defendant's arrest on May 25, the victim continued to live with Defendant. In July of 2021, the couple went to North Carolina for Defendant's job. After dinner one night in North Carolina, Defendant "slammed" the victim's head against the car. When the victim started screaming, Defendant started to strangle her. Defendant stopped when the victim stopped fighting him. When they returned to the hotel, Defendant strangled her again, and picked her up and threw her at the couch. The victim hit her head on something hard. The victim called the police. As a result, Defendant was charged with assault by strangulation and assault on a female. He pled guilty to two counts of assault on a female. The North Carolina court issued a no contact order. The couple returned to Tennessee together where Defendant was arrested again when the victim's sister called the police. While Defendant was being arrested, he gave the victim his cell phone. According to the victim, Defendant called her forty times on that phone while he was in custody. After his release, Defendant continued to contact the victim via text message, phone call, and in person. The victim estimated that Defendant sent her around 375 text messages. Despite being admonished by the trial court on September 7 to stop contacting the victim, Defendant continued to do so, even sending "pictures of his privates" to the victim. The victim admitted that she did not report all of the assaults and that she participated in

---

[2] It is somewhat unclear why Defendant's probation was to be supervised in Ohio. The presentence report prepared in this case indicates Defendant's home address in a town in Ohio.

conversations with Defendant after he was arrested even though she knew the no contact order was in place.

David Kitts, the program director of the special crimes unit for the Knoxville Police Department, testified that his office kept track of domestic violence statistics for Knox County. He testified that domestic related simple assault and aggravated assault had increased in the year prior to the offense. Mr. Kitts acknowledged that there was a decrease in statewide domestic violence offenses between 2020 and 2021 but attributed that decrease to a decrease in reporting during COVID-19 rather than a decrease in overall incidents.

The State also entered a "no progress" letter from the Knox County Probation office. The letter explained that Defendant was referred to probation on September 8, 2022, to complete a pre-sentence investigation. Defendant did not contact the office, and the probation officer was "unsuccessful" in contacting Defendant via phone, mail, and/or his Ohio probation officer. The letter concluded that Defendant was "not a suitable candidate for supervised probation." A follow up letter indicated that Defendant eventually contacted the probation office on November 8, 2022. Defendant asked the trial court to take note of the time he had already spent in incarceration.

The trial court observed that Defendant was a "pretty good-sized man" with an "extensive" history of criminal conduct. The trial court noted the victim was "not a very big person." The trial court recounted the "uncontroverted" proof that a "repetitive" pattern of abuse occurred despite Defendant's seemingly "quiet" and "reserved" behavior in court. The trial court deemed Defendant "dangerous" due to his inability to control his anger. The trial court also expressed "concern" about Defendant's continued failure to abide by and violate court orders, noting that judges in both Tennessee and North Carolina had ordered him to stay away from the victim, but that he had repeatedly violated those orders. Especially frustrated by Defendant's continued abuse of the victim, the trial court chastised Defendant for failing to "comply with a single one" of the court's orders, including meeting with probation.

At the conclusion of the hearing, the trial court imposed sentences of 11 months and 29 days on each of the five convictions. The trial court ordered Count 4 (violation of a no contact order) to be served consecutively to Count 2 (domestic assault). These sentences were ordered to be served in incarceration. The trial court ordered Count 5 (violation of a no contact order) to be served on supervised probation and run consecutively to Count 4; ordered Count 6 (violation of a no contact order) to be served on supervised probation and run consecutively to Count 5; and ordered Count 7 (violation of a no contact order) to be served on supervised probation and run consecutively to Count 6. The trial court conditioned probation on not violating any laws, and having "no contact, either directly or

indirectly, or otherwise engage in harassing, threatening, or intimidating behavior with [the victim]." Defendant was also ordered to pay restitution in the amount of $2,777.28.

Defendant filed a timely notice of appeal.

*Analysis*

*Failure to File Motion for New Trial*

We would be remiss if we did not begin our analysis by pointing out that the record does not contain a motion for new trial or an order denying a motion for new trial. "Before a defendant may raise an issue on appeal as the basis for seeking a new trial, the defendant must present the issue to the trial court in a timely, written motion for a new trial." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *2 (Tenn. Crim. App. Oct. 30, 2023) (citations omitted), *no perm. app. filed*. Except for issues related to the sufficiency of the convicting evidence and sentencing, the failure to file a timely motion for a new trial waives plenary review of all issues on appeal that could have resulted in a new trial. Tenn. R. App. P. 3(3); *see also State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). In that circumstance, a defendant may only obtain relief, if at all, under the standards governing plain error review. *See Howard v. State*, 604 S.W.3d 53, 62 (Tenn. 2020). In this case, whether by design or by serendipity, Defendant challenges only the sufficiency of the evidence, the trial court's denial of probation, and the trial court's imposition of consecutive sentencing. Therefore, despite the failure to file a motion for new trial, this Court is permitted to address all of Defendant's issues on appeal.

*Sufficiency of the Evidence*

Defendant first challenges the sufficiency of the evidence supporting his convictions for violating a no contact order in Counts 5, 6, and 7 on appeal. Defendant does not challenge his conviction for domestic assault. Specifically, Defendant insists that he "did not violate the conditions of a release on bond, as charged, where he was in custody, not on bond, at the time of his alleged contact with [the victim]." In other words, Defendant argues that because his bond was revoked by virtue of his incarceration, the "bond condition" on the conditional release order that prevented him from contacting the victim by telephone was no longer in place. While acknowledging that the conditional release order and no contact order are part of the same document, the State contends that the no contact order was distinct from the conditional release order and remained active through the "final disposition" of the case, so Defendant violated the no contact order by contacting the victim from jail. Therefore, the State argues that the evidence is sufficient to support the convictions.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis. We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The judgment forms in Counts 5, 6, and 7 reflect convictions for violating Tennessee Code Annotated section 39-13-113(i)(1). This section makes it an offense "to knowingly violate a no contact order, issued prior to a defendant's release on bond, following the defendant's arrest for any criminal offense defined in this chapter, in which the alleged victim of the offense is a domestic abuse victim as defined in [section] 36-3-601."

Defendant concedes that the victim was a domestic abuse victim, that he was arrested for committing an offense against the victim, and that he called the victim from the jail on August 13, 14, and 19. He argues, however, that his calls to the victim did not violate the conditional release order that "does not govern situations where the person is not on release, either because they have not been released yet or because that release has already been revoked." In other words, because he was not released from jail, he could not violate the conditional release order.

While the language of Tennessee Code Annotated section 39-13-113 seems fairly straightforward, the resolution of Defendant's argument requires us to examine the "Domestic Violence/Child Abuse Conditional Release Order" filed by the trial court. We have included the order in its entirety in the facts section of this opinion for ease of reference. This form order is provided by the Administrative Office of the Courts. *See* T.C.A. 40-11-150(c)(1).

In order to understand the conditional release order and the overall statutory scheme providing for the issuance of such order and no contact orders, we first look to the statute that sets forth the requirements for conditional release orders, Tennessee Code Annotated section 40-11-150. This statute appears in Chapter 11, entitled "Bail." When a defendant is arrested for certain offenses, including domestic assault like Defendant here, part (a) of Tennessee Code Annotated section 40-11-150(a) directs a trial court to review the facts of the arrest and detention of the defendant and determine whether the defendant is a threat to the "alleged victim," "public safety," and "reasonably likely to appear in court." Part (b) of the statute requires a magistrate to impose "one (1) or more conditions of release or bail on the defendant to protect the alleged victim of any such offense and to ensure the appearance of the defendant at a subsequent court proceeding." There are seven conditions listed in the statute.[3] Following the arrest of a person for certain specified offenses, including domestic assault, "the court or magistrate shall issue a no contact order containing all of the bond conditions set out in this section that are applicable to the protection of a domestic abuse victim." *Id.*

---

[3] These may include:

(1) An order enjoining the defendant from threatening to commit or committing specified offenses against the alleged victim;

(2) An order prohibiting the defendant from harassing, annoying, telephoning, contacting or otherwise communicating with the alleged victim, either directly or indirectly;

(3) An order directing the defendant to vacate or stay away from the home of the alleged victim and to stay away from any other location where the victim is likely to be;

(4) An order prohibiting the defendant from using or possessing a firearm or other weapon specified by the magistrate;

(5) An order prohibiting the defendant from possession or consumption of alcohol, controlled substances or controlled substance analogues;

(6) An order requiring the defendant to carry or wear a global positioning monitoring system device and, if able, pay the costs associated with operating that device and electronic receptor device provided to the victim, pursuant to § 40-11-152; and

(7) Any other order required to protect the safety of the alleged victim and to ensure the appearance of the defendant in court.

T.C.A. § 40-11-150(b)(1)-(7).

Of course, Defendant here was charged with a violation of Tennessee Code Annotated section 39-13-113(i)(1), a violation of a no contact order, *not* a violation of Tennessee Code Annotated section 40-11-150, a conditional release order. Reading Tennessee Code Annotated section 40-11-150 and Tennessee Code Annotated section 39-13-113(i)(1) together, the plain language of the statutes indicates that the conditional release order was distinct from the "no contact order" despite the fact that the two were on the same piece of paper. Before Defendant was released, the trial court made findings that Defendant was a threat to the victim, as required by Tennessee Code Annotated section 40-11-150(a)(1) and "[p]ursuant to" that finding, the trial court set release conditions *and* entered a "NO CONTACT" order. *See* T.C.A. §§ 40-11-150(a)(1), (m)(3) ("Prior to the offender's release on bond, the court or magistrate shall issue a no contact order containing all of the bond conditions set out in this section that are applicable to the protection of a domestic abuse victim."). These conditions appear in the form order reproduced above, under the section entitled "NO CONTACT" order. Again, both the conditional release and no contact order appear on a form provided by the Administrative Office of the Courts. *See* T.C.A. § 40-11-150(c)(1). The entire document specifies that only a "magistrate" can change the order and notifies Defendant that the order "remains effective through the final disposition" of his case.

Moreover, the fact that the statute with which Defendant was charged with violating specifies that a no contact order is enforceable independent of bail conditions further supports the conclusion that the "no contact order" is distinct from the "bond conditions" despite the fact that the two were on the same piece of paper.[4] "Neither an arrest nor the issuance of a warrant or capias for violation of this section in any way affects the validity or enforceability of any order of protection, restraining order, or no contact order." T.C.A. § 39-13-113(e). Similarly, the statute regarding conditional release contemplates that a person can be charged with violating a conditional release order as well as a violation of a no contact order. T.C.A. § 40-11-150(i)(1) ("A person who violates a condition of release imposed pursuant to this section shall be subject to immediate arrest. . . . If the violation of the condition of release also constitutes the offense of violation of a [no contact order] as prohibited by § 39-13-113, the person shall be charged with the offense."). A violation of a no contact order is punishable as a Class A misdemeanor. T.C.A. § 39-13-113(i)(2). A violation of a conditional release order that "does not also constitute a violation of § 39-13-113", on the other hand, is punishable as contempt of court. T.C.A. § 40-11-150(i)(2). Thus, the legislature clearly contemplated that a defendant could be charged with and

---

[4] This is not to say that the form order containing both bail conditions and the no contact order and/or the overall statutory scheme are entirely straightforward. The order itself states that a "VIOLATION OF THIS ORDER WILL CONSTITUTE CONTEMPT OF COURT AND MAY SUBJECT YOU TO IMMEDIATE ARREST AND MAY CAUSE YOUR BAIL TO BE REVOKED." In the interest of clarity, the order could perhaps also state that a "violation of the no contact order will constitute a violation of Tennessee Code Annotated section 39-13-113 and is punishable as a Class A misdemeanor."

convicted of both a violation of a no contact order and a conditional release order.[5] Further, the no contact order herein specified that it was to remain in place during the pendency of the entire case. The entire purpose of Tennessee Code Annotated section 40-11-150 is to "protect the alleged victims of domestic abuse from additional abuse." *Hopkins v. Bradley Cnty.*, 338 S.W.3d 529, 536-37 (Tenn. Ct. App. 2010). A no contact order is not simply a bail condition. It is a distinct set of rules that govern both the conditions of a defendant's release AND his actions, designed to protect the safety of the victim. Here, the no contact order was issued at the same time as the conditional release order and remained in place after Defendant was arrested and through the pendency of the case. Defendant admittedly repeatedly violated that order by contacting the victim from jail. The evidence is sufficient to support the convictions for violating the no contact order. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant challenges several aspects of his sentence. Defendant complains that the trial court erred in denying probation in Count 2, domestic assault, and Count 4, violation of a no contact order, because probation was in the interest of justice and the public. Defendant also takes issue with the trial court's decision to order consecutive sentencing based on his extensive criminal conduct. The State counters that the trial court properly exercised its discretion in imposing a sentence of confinement that included consecutive sentencing.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence received at trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the conduct involved; (5) evidence and information offered by the parties regarding the statutory mitigation and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make on his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This standard of review also applies to "the questions related to probation or any other

---

[5] We recognize that dual convictions for violation of a conditional release order and violation of a no contact order based on the same conduct could pose a double jeopardy issue but need not discuss such herein as Defendant was only charged with and convicted of violating a no contact order.

- 13 -

alternative sentence," *see State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012), and also to consecutive sentencing determinations, *see State v. Pollard*, 432 S.W.3d 851, 860-61 (Tenn. 2013). The burden of showing that a sentence is improper is upon the appealing party. *See* T.C.A. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001).

This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). *Carter*, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2) and (4). While there are no "'magic words' that trial judges must pronounce on the record, it is also critical that, in their process of imposing sentence, trial judges articulate fully and coherently the various aspects of their decision as required by our statutes and case law." *Trent*, 533 S.W.3d at 292. "[A]ppellate courts cannot properly review a sentence if the trial court fails to articulate in the record its reasons for imposing the sentence." *Bise*, 380 S.W.3d at 705 n.41. Trial courts are afforded considerable latitude in misdemeanor sentencing. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999). The "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998); *see* T.C.A. § 40-35-302.

Following a sentencing hearing, the trial court observed Defendant's large stature compared to the victim's small size and commented on his "extensive" history of criminal conduct. The trial court found the "uncontroverted" proof showed a "repetitive" pattern of abuse of the victim. The trial court deemed Defendant "dangerous" based on his failure to control his own anger. The trial court also highlighted Defendant's continued failure to ignore and violate court orders to stay away from the victim and meet with probation prior to the sentencing hearing.

The trial court ordered sentences of 11 months and 29 days on each of the five convictions, ordering the sentence in Count 4 (violation of a no contact order) to be served

consecutively to the sentence in Count 2 (domestic assault). The trial court ordered the sentence in Count 5 (violation of a no contact order) to be served on supervised probation and run consecutively to Count 4. The trial court also ordered the sentence in Count 6 (violation of a no contact order) to be served on supervised probation and to run consecutively to the sentence in Count 5; and ordered the sentence in Count 7 (violation of a no contact order) to be served on supervised probation and to run consecutively to the sentence in Count 6. The trial court conditioned probation on not violating any laws, and having "no contact, either directly or indirectly, or otherwise engage in harassing, threatening, or intimidating behavior with [the victim]." Defendant was also ordered to pay restitution in the amount of $2,777.28.

With respect to Defendant's challenge to the trial court's determination that he should serve his misdemeanor sentences incarcerated, Defendant contends his employment history and "criminal history . . . limited only to acts involving this same victim" weigh strongly in favor of granting "closely-monitored" probation. Given the latitude afforded to trial courts in misdemeanor sentencing, the record reflects a basis for requiring confinement in this case. The trial court considered the facts and nature of the conduct as well as Defendant's continued failure to comply with orders to stay away from the victim. Moreover, Defendant failed to establish his own suitability for probation, instead arguing that the State failed to show that "confinement was necessary to protect society" because the victim was the only person he harmed. The trial court did not abuse its discretion in denying probation.

Defendant also contends that the trial court erred in ordering partial consecutive sentencing. Specifically, Defendant asserts that the trial court failed to make the requisite findings to support its decision to run his sentences consecutively based solely on his "history of extensive criminal conduct." The State points to the evidence at the sentencing hearing, including multiple assaults over the two-year relationship between the victim and Defendant and Defendant's admission in a recorded telephone call that he had "pushed" and "shook" a former girlfriend.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order consecutive sentencing if it finds any one of the statutory criteria by a preponderance of the evidence. The trial court may impose consecutive sentences upon finding by a preponderance of the evidence that "[t]he defendant is an offender whose record of criminal activity is extensive." T.C.A. § 40-35-115(b)(2). A defendant's record of criminal activity is "extensive" if it is "considerable or large in amount, time, space, or scope." *State v. Perry*, 656 S.W.3d 116, 126-27 (Tenn. 2022). A trial court should consider the following list of non-exclusive factors when ordering consecutive sentencing on the basis of the defendant's record of criminal activity: (1) the "amount of criminal activity, often the number of convictions, both before the trial court for sentencing and prior convictions or

activity"; (2) the time period during which the defendant engaged in criminal activity; (3) the frequency of the criminal activity; (4) the locations where the criminal activity took place; (5) the number of victims; and (6) "[a]ny other fact about the defendant or circumstances" of criminal activity, "present or prior," that informs the court's determination. *Id.* at 129. "So long as a trial court properly articulates reasons for ordering consecutive sentences . . . the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *State v. Pollard*, 432 S.W.3d 851, 862 (Tenn. 2013). Defendant's abuse of the victim spanning several months and convictions for five separate counts related to the victim could certainly be considered extensive criminal activity. The trial court did not abuse its discretion. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE